O'CONNOR, J. and THOMSON, J. concur.

---

## Mary A. Connor, Defendant in Error, v. Irving H. Eddy, Plaintiff in Error.

### Gen. No. 28,306.

1. MEDICINE AND SURGERY—*question for jury as to negligence in diagnosis.* In an action against a physician for malpractice in the treatment of plaintiff's hip which was injured in a fall, on the ground that defendant was negligent in failing to discover an impacted fracture, where it appeared that defendant had X-ray pictures taken, which constituted the most scientific method of determining if there were a fracture, there was no such lack of skill or ordinary care shown to justify the submission of the question of negligence to the jury though greater care could have been exercised by having a larger number of X-ray pictures taken.

2. DIRECTING VERDICT—*showing essential to deny motion and allow withdrawal of juror.* In an action against a physician for malpractice where plaintiff's evidence failed to make out a case of actionable negligence and defendant asked for a directed verdict and the court indicated that the motion would be allowed but, following considerable discussion, the court granted a motion to

withdraw a juror and dismissed the case over defendant's objection without any substantial showing that upon a retrial plaintiff could obtain the evidence necessary to make out a case, the action of the court in denying defendant's motion for a directed verdict was error.

Error by defendant to the Municipal Court of Chicago; the Hon. JOHN J. ROONEY, Judge, presiding. Heard in the third division of this court for the first district at the March term, 1923. Reversed and remanded with directions. Opinion filed April 30, 1924.

EDWARD W. RAWLINS and BATES, HICKS & FOLONIE, for plaintiff in error.

FASSETT, ABBOTT & HUGHES, for defendant in error; EDWIN H. ABBOTT and JOHN E. HUGHES, of counsel.

MR. PRESIDING JUSTICE TAYLOR delivered the opinion of the court.

On August 5, 1919, the plaintiff, Mary A. Connor, brought suit in the municipal court against the defendant, Irving H. Eddy, a doctor, claiming that he had been negligent in his treatment of her for injuries which she suffered as the result of a fall.

In January 1921, a jury was impanelled, and then a juror was withdrawn on motion of the defendant, and the jury discharged.

On February 16, 1921, another jury was impanelled, and the record, as written up by the clerk, recites that a jury was called, impanelled and the trial begun; that on motion of the plaintiff a juror was withdrawn and the jury discharged; and that the case was called in open court and dismissed for want of prosecution. This writ of error is prosecuted by the defendant.

One of the claims of the plaintiff is that what took place was an involuntary nonsuit; whereas, it is the contention of the defendant that, according to what the bill of exceptions shows, what actually took place constituted a voluntary nonsuit, and that the court erred in refusing to grant a motion of the defendant for a

peremptory instruction to find the issues for the defendant at the close of the plaintiff's case, and in withdrawing a juror and discharging the jury and dismissing the case for want of prosecution.

At the trial on February 16, 1921, the evidence showed, substantially, the following: The plaintiff, a woman nearly 60 years old, weighing about 190 pounds, on March 6, 1918, fell at the corner of Paulina and Cullom streets and injured her right hip. She was taken home and Dr. Eddy, the defendant, an experienced surgeon, called. He made a careful, exhaustive examination. He recommended that an X-ray be taken of the injured parts. The plaintiff and her niece testified that the defendant said after examining the plaintiff that it looked like an impacted fracture of the hip and that it meant a long time in a hospital, and that he would make arrangements for X-ray pictures to be taken the next day. Dr. Eddy, himself, however, when called by the plaintiff, under section 33 [Cahill's Ill. St. ch. 37, ¶ 421], denied that he said it looked very much like an impacted fracture, but, that he might have said, it might be an impacted fracture. The niece also testified that when Dr. Eddy examined the plaintiff, the latter's foot fell outward to the right, fell over. Dr. Eddy testified there was no more than normal eversion. The next day, the plaintiff was taken to the Marshall Field Annex in an ambulance. Dr. Pease, an X-ray specialist, called by the plaintiff, testified that Dr. Eddy called him up the evening before and asked if it was possible for a lady to be taken to his, Dr. Pease's, office, on a stretcher, that he did not want to take her to the hospital and incur a lot of expense; that he, Dr. Pease, told Dr. Eddy it would be possible, and accordingly she was taken to his office and certain plates were taken. It was arranged that if the plates showed a fracture, she was to be sent to a hospital, otherwise, to be sent home. After four or five plates

were taken she was sent home. Dr. Pease testified that he made a diagnosis of the plates for Dr. Eddy, and that they were negative as to pathology, showed no fracture; that Dr. Eddy was called up and so informed. The plaintiff was a large woman and it was difficult to get satisfactory plates. Two of the plates were preserved, Dr. Eddy having one and Dr. Pease the other. Dr. Pease took the plates in the evening, or the next morning, to Dr. Eddy, and they looked at the plates together. Dr. Eddy visited the plaintiff the next morning and told her she had no broken bones, but had a bad bruise. Two or three days later he called and examined her, and said she must not stay in bed, but must get up and exercise the leg. He called five times altogether.

Subsequently, the plaintiff called a woman doctor, Dr. Rich, and she got an osteopath to treat the plaintiff. That was in July. On July 26, the plaintiff had one Dr. Eberhardt, take some X-ray pictures. In November she called Dr. Eddy, and when he examined the new X-ray plates, he said they showed an impacted fracture of the hip. The plaintiff testified that Dr. Eddy, further, said that he was not to blame, because the other X-rays did not show it. One, Dr. Perrill, testified that on August 5, 1919, he examined the plaintiff's right hip and found that the right leg was everted and shortened about two inches and that there was some fixation of the hip; and that the hip had been fractured for some time. Dr. Perrill further gave it as his opinion that in case of injury to the hip, if the foot, while the patient is lying down, turns out to the right and the patient has no control over it, is unable to put it back in place, it is evidence of a fracture. An hypothetical question, purporting to contain a recitation of what the evidence for the plaintiff tended to show, was propounded to Dr. Perrill, and he was asked if it was customary for the attending surgeon to rely entirely upon the X-ray report,

and the doctor answered, "Yes it is proper." And, when asked, with similar assumptions, and the added fact that the doctor, the day after the X-ray was taken, ordered the patient to exercise the right leg, if such an order was usual and customary, Dr. Perrill answered, "In the assumed case, with no further injury, a surgeon is justified in giving such an order." Dr. Perrill further testified that absorption usually follows an impacted fracture of the neck of the femur, especially where persons are about sixty years of age; that that is true no matter what treatment is administered; and in cases of people of 60 years of age, it happens that you never get any union at all, no matter what treatment is administered. Another hypothetical question was propounded to Dr. Perrill —in which it was assumed that one of the X-ray pictures showed no fracture, and one did, and that the man in charge of the X-ray laboratory reported to the attending surgeon that there was no evidence of any bone pathology—by which he was asked if it was proper for the attending surgeon to order the patient to walk; and to that question Dr. Perrill answered that it was justified.

One, Nettie M. Hurd, an osteopathic physician, testified that she examined the plaintiff in July, 1918, and found the plaintiff's right leg to be a little over an inch short; that she lifted the leg to see if it would maintain itself in position, and found that it would not, and gave it as her opinion that there had been a fracture; that she was present when the X-ray was taken at Dr. Eberhardt's, and examined the plaintiff through a fluoroscope; that she saw an abnormal shadow which is usually found in an impacted fracture of the neck of the femur.

It is contended for the plaintiff that the evidence showed that the defendant was guilty of malpractice, and in support of that contention cites the case of *Bonnet v. Foote*, 47 Colo. 282. In that case, the plain-

tiff had fallen and injured her hip, and called the
defendant, a doctor, who examined her and said he
was afraid she had suffered a fracture; and the next
morning examined her again, by feeling the parts with
his hands, and concluded that there was a bruise but
no fracture.   Subsequently, he made frequent exam-
inations, and measurements for the purpose of ascer-
taining whether or not the leg was shortening, but
at no time regarded the injury as more than a severe
bruise.   There was evidence that, when the plaintiff
was lying on her back, her right foot laid over on the
side, that when it was straightened up, it would then
fall back again, and that the doctor said he did not
like that, and could not understand why it occurred.
The court said that it was clear there was a fracture
and the question was ''whether or not it appears that
defendant was guilty of negligence in diagnosing and
treating her injury;'' and held that, as it was plain
from the fact that the plaintiff's foot lay over on one
side, to which his attention was directed, ''either he
did not possess that degree of learning and skill which
the law requires of surgeons; or, if he did, he failed
to exercise ordinary care in applying it.''   The evi-
dence in that case is very different from the evidence
in this.   Here the defendant resorted to the sup-
posedly safest scientific means of obtaining the truth,
the X-ray, and by it was informed that there was no
fracture.   That was evidence of the greatest care, far
more than reliance upon mere manual examination.
It is true that more X-rays might have been taken,
especially as the parts to be examined were deep and
obscure.   But, although greater care was possible, we
do not think the evidence showed in any way a lack
of skill or ordinary care as a surgeon, nor that there
was enough evidence to justify its submission to the
jury.

It is contended, further, that the action of the court
brought about an involuntary nonsuit.   At the close of
the plaintiff's evidence, counsel for the defendant

moved the court to instruct the jury to find the issues in favor of the defendant. Following that, out of the presence of the jury, the trial judge, being of the opinion that the evidence, as a matter of law, did not make out a case, entered into a long colloquy with counsel, as to what should be done. It is in substance as follows: Mr. Rawlins, counsel for the defendant, ''If the court please, there is now in this record no evidence competent or tending to show a case of malpractice or anything that would warrant the submission of this case to the jury.''

The Court (to Mr. Hughes, counsel for plaintiff): ''If I am right on my rulings this morning, the witness that you put on the stand to prove that he was negligent, answered in the affirmative and opposed to what I thought he would answer. Following that case, what evidence have I got here that he negligently failed to do what an ordinarily prudent person would do under like or similar circumstances. * * * Let us confine ourselves to what we have here. * * * I will give you one opportunity. I am afraid that I am against you. I think you will do better to withdraw a juror and dismiss this suit.

''Mr. Hughes: It would not do me any good. The only thing I can do is to take it to the Supreme Court.

''The Court: No. If you think you can fix it so as to get a better record, I will allow you to withdraw a juror and I will dismiss it on my own motion. That will give you a year to commence it. I suggest that at this time. I can see the handicap that you are under here. * * * I don't like to dismiss that woman out of court or foreclose her. * * *

''Mr. Hughes: I was disappointed, of course, in what the doctor said * * * .

''Mr. Rawlins: * * * It seems to me that we are entitled to have a verdict directed.

''The Court: The only possible chance that I can see would be for you to put on an expert and put on

evidence tending to show that it is not customary in the profession to abide by the decision of an X-ray man; that it was the duty of the doctor to make further investigation as to whether or not there was a fracture there.    If you had evidence of that kind, there might be something to it.   *   *   *

"The Court:   You want me to direct a verdict?

"Mr. Hughes:   No, I will not say I am willing.   I object to it.

"Mr. Rawlins:   We have tried this case.   We have spent our time and money and this case is rested.

"The Court:   I know, but he is entitled to another chance, I think.

"Mr. Rawlins:   I ask that a verdict be directed to the jury to find the issues for the defendant.

"Mr. Hughes:   I think that what the court suggested should be done rather than granting a motion directing a verdict.

"Mr. Rawlins:   I don't think, under the situation of this case, that that is the right thing to do.   Here is a case where all of these learned doctors have conferred with them; here is a situation where it is so patent that the man was doing the right thing—

"The Court:   That is the only thing that is bothering the court.   I can't see that this doctor did anything that the ordinary doctor would not have done. *   *   *

"Mr. Rawlins:   This case should not be continued to allow them to try to get further evidence.

"The Court:   What have you got in mind, if you try this lawsuit over, what additional facts would you have?

"Mr. Hughes:   I would expect to introduce what Dr. Pease told me in conversation with me, that where a patient was not making satisfactory progress, that where one X-ray was taken and it was not satisfactory, that it was customary to have five or six taken, and sometimes eight.   I would also show that an X-ray

was not conclusive and that it was not proper practice to rely on the showing of an X-ray picture.

"The Court: Who is going to testify to that?

"Mr. Hughes: I hope to get doctors to do it.

"The Court: I will give him another chance. The motion is to withdraw a juror.

"Mr. Rawlins: I object to the granting of this motion to withdraw a juror, because the plaintiff announced that he had rested his case, put in all of his evidence. He does not claim that he had any in addition, and we have been put to the expense of this trial. This is the second time. We started in once before. There is no ground or reason for permitting the motion to withdraw a juror in this case.

"The Court: I think that is within the discretion of the court: Leave to withdraw a juror is granted and leave is given to withdraw a juror.

"Mr. Hughes: Mr. Rawlins' statement that I can't produce additional evidence is not strictly in accordance with the fact because I do claim I can produce additional evidence.

"Mr. Rawlins: I do not think it amounts to that. This is not an involuntary nonsuit. The court had already indicated that the burden was on the plaintiff to show why the court should not direct a verdict, and then the plaintiff made his motion, requesting that the court permit him to have a chance to make out his case, so that he could start over and not be barred by limitations.

"The Court: I think counsel will not attempt to try this case over unless he has additional evidence. It would be a waste of time to come before another jury unless you had additional evidence.

"Mr. Hughes: No, I would not do it unless I had additional evidence.

"The following further proceedings then ensued in open court:

"The court of his own motion withdrew a juror,

to which action of the court the defendant by his counsel then and there duly excepted, and thereupon the court of his own motion dismissed said cause for want of prosecution.''

The record, therefore, discloses that, at the close of the plaintiff's evidence, the defendant asked for an instructed verdict, and the court stated that he thought under the evidence the motion would be allowed, since the plaintiff had not made out a case. Following that, there was considerable discussion between the court and counsel, and, from what was said at that time, it is quite apparent that the plaintiff—because the expert testimony of the doctor called by the plaintiff showed that the defendant had not been guilty of malpractice —had failed to make out a case, and the trial judge thought, by having the case dismissed, the plaintiff might be able to secure other surgeons or physicians who would testify to the facts showing that there was malpractice on the part of the defendant. Plaintiff's counsel said he thought he might get physicians to give such testimony.

What the court finally did, took place over the defendant's objection. The practice in this respect is one with which we are not at all familiar. In a proper case, the plaintiff might have withdrawn a juror and asked that the court continue the case until he could bring in other witnesses; but in the course of the trial, apparently, that was not thought of. Considering what the court did, in its essence, and looking at the record as a whole, it is obvious that while the record as written up recites that the dismissal was involuntary, yet, in substance, the dismissal was voluntary, because the plaintiff had not made out a case, and the court should not have dismissed the suit for want of prosecution unless there was some substantial showing that upon a retrial of the case plaintiff could obtain the evidence which was lacking, and that he had not been guilty of negligence. Whether plaintiff could obtain the lacking evidence was entirely speculative.

On the whole record, we are of the opinion that the trial court erred in denying the defendant's motion for a directed verdict. The judgment of the municipal court therefore, is reversed and the cause remanded to that court with directions to enter a judgment for costs in favor of the defendant and against the plaintiff.

*Judgment reversed and cause remanded.*

O'CONNOR, J. and THOMSON, J. concur.